<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                                          :
G.N. and S.N., on behalf of J.N., a minor,    :
                                                          :
            Plaintiffs,                                 :
                                                          :            Civil Action No. 05-3325 (JAG)
                        v.                                :
                                                          :                    **OPINION**
BOARD OF EDUCATION OF THE          :
TOWNSHIP OF LIVINGSTON,               :
                                                          :
            Defendant.                               :
_____:


<u>**GREENAWAY, JR., U.S.D.J.**</u>

This matter comes before this Court on the motion for summary judgment, pursuant to

Fed. R. Civ. P. 56, of Plaintiffs G.N. and S.N., on behalf of their minor child, J.N. (collectively,

"Plaintiffs").  For the reasons set forth below, the motion will be DENIED.

## BACKGROUND

This Individuals with Disabilities Education Act ("IDEA") case arises from the school

placement of Plaintiff J.N., a minor, for the 2004-2005 academic year.  Plaintiffs G.N. and S.N.

(collectively with J.N., "Plaintiffs") brought this case on behalf of J.N.  At issue is the Individual

Education Program ("IEP") developed for J.N. by the child study team ("CST")[1] of the Board of

Education of the Township of Livingston (the "District" or "Defendant") and the procedure by

_____

[1] The CST consists of a school psychologist, a learning disabilities teacher-consultant, and a school social worker.  N.J. Admin. Code § 6A:14-3.1(b).  One member of the CST must be designated as the student's case manager.  N.J. Admin. Code § 6A:14-3.2(a).

which it was developed.  Plaintiffs argue that the District failed to provide a free appropriate

public education (a "FAPE").  A significant portion of Plaintiffs' disagreement stems from the

Defendant's decision to remove J.N. from some "mainstream" classes, where she was receiving

in-class support in reading and language arts, and placing her in a specialized resource center (the

"Resource Center") for integrated reading and language arts ("IRLA").  As a result of their

disagreement with the IEP, J.N.'s parents unilaterally removed J.N. from the Livingston School

District, and enrolled her in the Winston School, a school for children with dyslexia, located in

Short Hills, New Jersey.

Plaintiffs also seek reimbursement of tuition and expenses incurred (including attorneys'

fees) for their unilateral placement of J.N. in the Winston School.

On February 5, 2004, Plaintiffs filed a request for mediation with the New Jersey

Department of Education's Office of Special Education Programs, challenging the

appropriateness of the IEP.  After unsuccessful attempts at mediation, the matter was transferred

to the New Jersey Office of Administrative Law ("OAL").  Administrative Law Judge Sandra

Ann Robinson ("ALJ Robinson") held a due process hearing in September and October 2004.

On January 31, 2005, ALJ Robinson rendered her opinion, concluding that the District "has met

its burden of demonstrating that it provided and offered [J.N.] a free [] appropriate public

education in the least restrictive environment."  (Opinion of Administrative Law Judge Sandra

Ann Robinson, dated January 27, 2005 ("ALJ Opinion") at 34.)  For that reason, ALJ Robinson

concluded that Plaintiffs "are not entitled to reimbursement for their unilateral placement of

[J.N.]"  (Id.)

On June 30, 2005, Plaintiffs filed the instant action challenging ALJ Robinson's findings

and decision.  Allowing the matter to proceed by way of summary judgment, Magistrate Judge

Madeline Cox Arleo issued an order requiring the determination of liability to be based

exclusively upon the record from the proceedings held in the Office of Administrative Law.

Defendants did not file a cross-motion for summary judgment.[2]

## I.      Individuals With Disabilities Education Act

Congress created the IDEA "to ensure that all children with disabilities have available to

them a free appropriate public education" and "to ensure that the rights of children with

disabilities and [their] parents . . . are protected."  20 U.S.C. §§ 1400(d)(1)(A) and (B).  Pursuant

to the IDEA, schools must create an IEP for each student that is designated as eligible for special

education.  20 U.S.C. § 1414(d)(1)(A).  "[T]he purpose of the IEP is to guide teachers and to

insure [sic] that the child receives the necessary education."  Lascari v. Bd. of Educ., 116 N.J. 30,

48 (1989).

An IEP is developed by a team that consists of the child's parents, one of the child's

special education teachers, a curriculum specialist, and, if requested, a person with special

knowledge or expertise related to the child's education.  20 U.S.C. § 1414(d)(1)(B).  In the

instant case, the CST and J.N.'s parents make up this team.  The team must meet annually to

determine whether the goals set for the child are being achieved.  20 U.S.C. § 1414(d)(4).

A parent may reject an IEP if he or she feels that it does not provide their child with a

FAPE.  A parent may then request a due process hearing or a mediation conference to address

their rejection of the IEP.  Lascari, 116 N.J. at 36.

_____

[2] At oral argument, both parties agreed that the determination of this motion, even if
denied, fully resolves the case.

## II.      The Facts

At the time of this opinion, J.N. is enrolled as a ninth grade student in the Chatham

School District in New Jersey.  J.N. and her parents are not domiciled in Livingston, and J.N. has

not attended classes within the Livingston Public School District since the sixth grade (the 2003-

2004 school year).

J.N. has been diagnosed with Developmental Reading Disorder ("Dyslexia"),

Developmental Writing Disorder, and Attention Deficit Hyperactivity Disorder ("ADHD").

(ALJ Opinion, Ex. P-2 at 8-12.)  The District classified J.N. as eligible for special education

under the category "specific learning disability" in J.N.'s second grade year.  (ALJ Opinion, Ex.

P-2 at 3.)  The District provided J.N. with special education from second grade through the

conclusion of third grade, including multi-sensory phonics training in her school's Resource

Center in the second and third grades.  (Id.)  In the fourth grade, J.N. received in-class assistance

with language arts and social studies, but requested to forgo being removed from class for

reading remediation in the Resource Center.  (Id.)  She rejoined the Resource Center in February

of her fourth grade year.  (Id.)  In fifth grade, J.N. received in-class support for IRLA and social

studies, and participated in the Resource Center.  (Id.)  In sixth grade, J.N. received in-class

support for IRLA, science, and social studies, and continued the out-of-class, Resource Center

support for IRLA.  (ALJ Opinion, Ex. R-41 at Parts B1-3.)

J.N.'s parents were not satisfied with J.N.'s progress during sixth grade, and requested a

meeting with the CST to discuss possible changes to J.N.'s IEP for her seventh grade (2004-

2005) school year.  (ALJ Opinion, Ex. P-8 at 1-2.)  The meeting was scheduled for January 23,

2004.  (ALJ Opinion, Ex. R-53.)

Prior to the meeting with the CST, Plaintiffs consulted a private learning disabilities teacher-consultant, Maria Zdroik.[3]  (ALJ Opinion, Ex. P-5.)  Zdroik recommended that 1) J.N.'s IEP include goals and objectives in the areas of decoding, organization, and self-management; and 2) J.N. receive, in addition to her mainstream, in-class support in IRLA, a "pull-out" Wilson Reading Program[4] during the summer as an extended school year service ("ESY").  (ALJ Opinion, Ex. P-5).  J.N.'s parents forwarded this report, as well as several of their own suggestions for the IEP, to the CST.  (ALJ Opinion, Ex. P-5.)

Plaintiffs' requests included, inter alia: 1) no penalty for incomplete homework where J.N. provides a parental note; 2) quiz and test questions should be re-worded if misunderstood; 3) no penalization for misspelling; 4) provide structure for writing reports by providing J.N. an outline prior to the assignment; 5) provide written study guides; 6) time extensions for examinations; 7) highlight key words on tests and quizzes; 8) no reading aloud in class unless J.N. volunteers; 9) organizational tutoring by a professional; and 10) inform her parents when J.N. fails to complete an assignment in lieu of penalization.

Prior to the January 23 meeting, J.N.'s case manager, and member of the CST, Helen

---

[3] As acknowledged by counsel for Plaintiffs at the administrative hearing, Ms. Zdroik's report was admitted into evidence at the administrative hearing solely for the purpose of establishing the report's existence, and not for the truth of its contents.  This was because Ms. Zdroik did not testify at the hearing, and, therefore, her opinions could not be contested.  Thus, this Court does not rely on the contents of the report prepared by Maria Zdroik.  Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 758 (3d Cir. 1995) (a court has the authority to exclude certain evidence that could have been available at the administrative hearing).  Further, Magistrate Judge Arleo issued an order wherein the parties were limited to the evidence set forth in the administrative proceeding.  This Court cites to the report only to highlight the requests that Plaintiffs made.

[4] The Wilson Reading System is a multi-sensory, structured reading and spelling curriculum.  (Wilson Language, http://www.wilsonlanguage.com (last visited July 23, 2007).)

Fersko, suggested that J.N.'s parents visit Mt. Pleasant Middle School's Resource Center IRLA class.  (ALJ Opinion, Ex. R-57 at A-3.)  J.N.'s parents visited the program, but did not believe that the program would be beneficial for J.N.  (Testimony of S.N., T5:86-87.)[5]

At the January 23, 2004, meeting with the CST, Helen Fersko explained that the CST recommended the Resource Center for J.N. for IRLA.  (Testimony of Helen Fersko, T1:117:22-25.)  The draft IEP provided to J.N.'s parents at the meeting did not reflect this recommendation.[6] (ALJ Opinion, Ex. R-55 at B-1.)  J.N.'s parents maintained their request that J.N. stay in mainstream classes for IRLA, and not attend the Resource Center.  (Testimony of Helen Fersko, T1:117:25 to 118:3.)  The CST, as reflected in the final IEP, acquiesced to J.N.'s parents' request that J.N. remain in mainstream classes.  (ALJ Opinion, Ex. R-57.)  At the end of the meeting, J.N.'s parents did not sign the draft IEP; instead, they requested to review it further at home. (T4:212:11-18.)

On January 28, 2004, Plaintiffs sent a letter to Helen Fersko expressing their concerns and disagreement with the draft IEP.  (ALJ Opinion, Ex. R-62.)  Specifically, Plaintiffs disagreed with the fact that the draft IEP did not contain goals and objectives in the event that J.N. was not placed in the Resource Center.  (Id.)  Plaintiffs also expressed concerns that they were asked to sign an incomplete IEP.  (Id.)

On January 30, 2004, Fersko responded to Plaintiffs' concerns with her own letter.  (ALJ Opinion, Ex R-65.)  Fersko cited to J.N.'s improvement in standardized test scores as a tangible

---

[5] This abbreviation indicates the volume and page of the transcript from the hearing conducted by ALJ Robinson on September 28, 29, and 30, and October 26 and 28.

[6] A second draft, which the District brought to the meeting, but did not provide to J.N.'s parents, reflected this recommendation.

means of addressing Plaintiffs' concerns with J.N.'s progress.  (Id.)  Fersko also relayed that the

CST recommended that 1) J.N.'s parents consult with their family physician regarding

resumption of medication for J.N.'s ADHD; 2) J.N. should be placed in the Resource Center for

IRLA for small group instruction in phonics and spelling; and 3) J.N. should use recorded books

for leisure and school reading.  (Id.)  Fersko also outlined the District's position that "[g]oals and

objectives are written only for subjects taken in the Resource Center, not those taken in the

mainstream."  (Id.)  Further, Fersko explained that phonics and spelling instruction was not

available in the summer via the Resource Center.  (Id.)  Fersko acknowledged that J.N.'s parents

rejected the draft IEP, and refused to provide the draft IEP that was discussed, but not provided,

at the meeting.  (Id.)  Fersko only forwarded a finalized version of the draft IEP.  (Id.)

The finalized IEP did not include the following requests made by J.N.'s parents: 1) goals

and objectives; 2) supplemental instruction (organizational tutoring by a professional); 3) a

specific homework accommodation (no penalty for late homework); and 4) ESY services (the

"Wilson Program").  (ALJ Opinion, Ex. R-57.)

On February 5, 2004, Plaintiffs filed a request for mediation from the New Jersey

Department of Education's Office of Special Education Programs to challenge the

appropriateness of the IEP.  (New Jersey Department of Education Request for Mediation/Due

Process Hearing/Expedited Due Process Hearing Form, dated February 5, 2004.)  The attempts at

mediation were unsuccessful.

On June 25, 2004, Plaintiffs filed a petition with the New Jersey Office of Administrative

Law for a due process hearing, pursuant to 20 U.S.C. § 1415(f).  Plaintiffs' petition included the

statement that "[u]nless such specific services are offered immediately, J.N.'s parents will have

no choice but to try to secure a private school placement for J.N. where her needs can be met without further delay, and in time for the 2004-2005 school year." (Plaintiffs' Petition filed with the Office of Administrative Law, dated June 25, 2004, at 5.) Defendant filed its answer on July 6, 2004. After settlement negotiations failed, the case was adjourned until September 2004.

Upon realizing that the due process proceeding would take place after the commencement of the 2004-2005 school year, J.N.'s parents began looking into private school options. (T4:226-227.) R.N., J.N.'s father, testified that he sent a letter, drafted by counsel for Plaintiffs, notifying the school district of the unilateral decision to place J.N. in the Winston School. (T4:229:20 to 230:13.) This letter was not introduced into evidence. S.N., J.N.'s mother, however, testified that the Petition to open the due process hearing provided notice of the unilateral placement.

On July 8, 2004, J.N.'s parents enrolled J.N. in the Winston School. (T5:90:12-14.) J.N. began classes at the Winston School on September 7, 2004. (T5:90:13-15.)

The administrative hearing was conducted on September 28, 29, and 30, and October 26 and 28, before ALJ Robinson. A final decision was issued by ALJ Robinson on January 31, 2005, concluding that the IEP was appropriate and denying Plaintiffs' request for relief.

## III.    Disputed Findings of the ALJ

In her final determination, ALJ Robinson found that "the annual goals and the objective short-term benchmarks by which progress is measured, evaluated[,] and reported has been included in the IEP." (ALJ Opinion 34.) This Court disagrees with ALJ Robinson's finding.

It is clear, from the face of the finalized IEP, that no goals and objectives were included. (ALJ Opinion, Ex. R-57.) Further, Ms. Fersko testified that the final IEP did not include "goals and objectives" because, at the insistence of J.N.'s parents, J.N. was only in mainstream classes,

8

and, in her (Fersko's) opinion, when a student is in mainstream classes only, the "goals and objectives" are "that of the core content standards and the curriculum guide is available either [in] the principal or the superintendent's office." (T1:123:23 to 124:7.)

In addition to overruling the ALJ on her finding that goals and objectives were included in the IEP, this Court also disagrees with the ALJ's finding that "the parents had agreed with the January 2004 IEP with the understanding that [J.N.] would be in a mainstream class with in-class support." (ALJ Opinion 33.) The record reflects, as set forth by the testimony of Helen Fersko that the parents did not agree with the draft IEP and took it home to review. (T4:212:11-18.)

## STANDARD OF REVIEW

"Any party aggrieved by a placement decision may bring suit in a state court of competent jurisdiction or a federal district Court." Shore Regional High School Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004); see 20 U.S.C. § 1415(i)(2). The motion before this Court is for summary judgment, although it is essentially an appeal of ALJ Robinson's decision. However, a district court's review in IDEA cases "differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 757 (3d Cir. 1995).

In Board of Education v. Rowley, the Supreme Court of the United States set forth the unique standard of review for federal district courts to use when reviewing the decisions of an ALJ in an IDEA case: "[t]he fact that [20 U.S.C. ]§ 1415(e) requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that *due weight* shall be given to these proceedings." Bd. of Educ. of Hendrick

Hudson Central Sch. Dist., Westchester County v. Rowley, 458 U.S. 176, 206 (1982) (in essence, the "due weight" standard helps "prevent the court from imposing its own view of preferable educational methods on the states") (emphasis added).

The Third Circuit has interpreted the "due weight" standard, set forth in Rowley, as requiring a district court to apply "modified de novo" review. S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 269-70 (3d Cir. 2003). In applying modified de novo review, "a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings." Id. at 270 (quoting Knable v. Bexley City Sch. Dist., 238 F.3d 755, 764 (6th Cir. 2001)).

"A federal district court reviewing the administrative fact finder in the first instance is . . . required to defer to the ALJ's factual findings unless it can point to contrary nontestimonial extrinsic evidence on the record." Id. Where a district court decides to hear additional evidence it is "free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the Act." Id. (quoting Oberti v. Bd. of Educ. of the Borough of the Clementon Sch. Dist., 995 F.2d 1204, 1220 (3d Cir. 1993)). If the district court decides not to hear additional evidence, then "it must find support for any factual conclusions contrary to [those of] the ALJ . . . in the record before it[, and] explain why it does not accept the ALJ's findings of fact, to avoid the impression that it is substituting its own notions of sound educational policy for those of the agency it reviews." Id.

## **DISCUSSION**

Plaintiffs set forth several arguments in support of their contention that Defendant failed to provide J.N. with a FAPE.  Specifically, Plaintiffs argue that the District committed several procedural violations of the Act: 1) Defendant failed to provide a statement of measurable annual goals; 2) Defendant ignored Plaintiffs' requests for services and accommodations; 3) Defendant failed to offer J.N. a full continuum of special education programs by failing to offer more than a choice between mainstream classes with in-class support or placement in the resource program; 4) Defendant failed to offer services and accommodations, by simply maintaining the status quo after the IEP meeting; and 5) Defendant denied Plaintiffs access to the draft IEP.

In order to show that a procedural problem is sufficient to constitute denial of a FAPE, a plaintiff must demonstrate that the procedural inadequacy 1) resulted in "the loss of educational opportunity", Burke County Bd. of Educ. v. Denton, 895 F.2d 973, 982 (4th Cir. 1990), or 2) seriously infringed the parents' opportunity to participate in the process of formulating the IEP.  Roland M. v. Concord School Committee, 910 F.2d 983, 994 (1st Cir. 1990); see C.M. v. Bd. of Educ. of Union County Reg'l High Sch. Dist., 128 F. App'x 876, 881 (3d Cir. 2005) (adopting the holdings of Roland and Burke).

Traditionally, the burden of proof in IDEA was placed on the school district.  In Schaffer v. Weast, 546 U.S. 49, 62 (2005), the Supreme Court of the United States held that the burden would rest with the party seeking relief.  The Third Circuit, in L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 391 (3d Cir. 2006), applied the burden of proof as set forth in Schaffer.  The Ramsey Court did so after offering the parties an opportunity to supplement their briefing in the wake of the decision in Schaffer.  The burden, therefore, rests with Plaintiffs as the party challenging the

ALJ's determination to demonstrate that the District's proposed IEP did not offer J.N. a FAPE.

## I.     Procedural Claims

### A.     Goals and Objectives

Plaintiffs' primary argument regarding alleged procedural failures in developing the IEP centers around the failure of the District to include a "statement of measurable annual goals that shall be related to the core curriculum content standards through the general education curriculum." N.J. ADMIN. CODE § 6A:14-3.7(d)(2) (2003).[7]  As set forth above, this Court expressly rejects ALJ Robinson's finding that the IEP contained goals and objectives.

Having overruled the ALJ on this point, this Court must determine whether the failure to include goals and objectives denied J.N. access to a FAPE.  Ms. Fersko's testimony regarding the goals and objectives is important to establish that none were set forth.  Ms. Fersko stated that "[it's] part of the IDEA that when a child does come out of the mainstream[,] they must have

---

[7] The quoted language comes from the version of N.J. ADMIN. CODE § 6A:14-3.7(d)(2) that was effective from October 6, 2003 to September 4, 2006.  It states, in pertinent part,

> [w]ith the exception of an IEP for a student classified as eligible for speech-language services, the IEP shall include, but not be limited to . . . [a] statement of measurable annual goals that shall be related to the core curriculum content standards through the general education curriculum unless otherwise required according to the student's educational needs.

The current language of this section is found at N.J. ADMIN. CODE § 6A:14-3.7(e)(2), and reads

> [w]ith the exception of an IEP for a student classified as eligible for speech-language services, the IEP shall include, but not be limited to . . . where appropriate, a statement of detailed measurable annual academic and functional goals that shall, as appropriate, be related to the core curriculum content standards through the general education curriculum unless otherwise required according to the student's educational needs, or appropriate, student specific, functional needs.

(emphasis added to indicate new language).

12

goals and objectives . . . [but, i]f they're in the mainstream program, they're [sic] monitoring is

the report cards and the current . . . status and IEP meetings and team conferences, [and] progress

reports from teachers that are sent home."  (T1:124:11-18)

  This opinion (Ms. Fersko's) is not supported by the text of IDEA or the New Jersey

Administrative Code provisions which implement IDEA.  At the time when J.N.'s IEP for

seventh grade was developed, late 2003 and early 2004, the pertinent IDEA section, 20 U.S.C. §

1414(d)(1)(A)(ii), stated that "IEP means a written statement for each child with a disability that

is developed, reviewed, and revised in accordance with this section and that includes . . . <u>a</u>

<u>statement of measurable annual goals, including benchmarks or short-term objectives</u> . . . "  20

U.S.C. § 1414(d)(1)(A)(ii) (emphasis added).  Further, N.J. ADMIN. CODE § 6A:14-3.7(d)(2)

states: "the IEP shall include, but not be limited to . . . [a] statement of measurable annual goals

that shall be related to the core curriculum content standards through the general education

curriculum unless otherwise required according to the student's educational needs."[8]

  The failure to include goals and objectives violates IDEA.  However, to elevate this

failing to a denial of a FAPE would be elevating form over substance.  The true question is

---

  [8] Defendant's arguments in support of Fersko's opinion, that goals and objectives are unnecessary where a student is in mainstream classes, are unpersuasive.  Defendant cites to a portion of IDEA which was not in effect in 2003-2004.  Further, the administrative cases, which Defendant sets forth for the proposition that goals and objectives are not necessary for students who are completely mainstreamed, are factually distinguishable.  In <u>N.P.</u>, there are some goals or objectives written in the report.  <u>N.P., by R.C.P. v. Kinnelon Bd. of Educ.</u>, 1992 WL 394850, *20, 92 N.J.A.R. 2d 190, OAL Docket No. 3465-92 (N.J. Adm. Aug. 13, 1992) ("The IEP contains statements of numerous objectives with regard to Transition Programming including Community Living Skills, Vocational Skills, Independent Living Skills, Interpersonal Skills, and Recreational Skills.").  In <u>M.S. v. Bd. of Educ.</u>, an ALJ held that goals and objectives are not included in the IEP of a child who is in all mainstream classes, but based the legal holding on the opinion of an expert, not case law.  <u>M.S. and C.S. o/b/o A.S. v. Bd. of Educ. of the Village of Ridgewood</u>, 2004 WL 763588, *8, OAL Docket No. 5814-03 (N.J. Adm. Mar. 16, 2004).

whether the failure to include goals and objectives 1) resulted in the loss of educational

opportunity, or 2) seriously infringed the parents' opportunity to participate in the process.

     In <u>Doe v. Defendant</u>, 898 F.2d 1186, 1190 (6th Cir. 1990), the plaintiffs contended that

they were denied a FAPE because the IEP did not contain a reference to the student's present

educational performance.  It also failed to included objective criteria and evaluation procedures.

The Sixth Circuit held that

> to say that these technical deviations from section 1401(19) render appellant's IEP
> invalid is to exalt form over substance. It is undisputed that appellant's most recent
> grades were known by both the parents and the school officials.  Moreover, because
> he was to be given instruction in the regular classroom, he would be graded
> according to the normal criteria used in the class. Only his method of instruction
> would be different. Thus, the parents and administrators had all of the information
> required by section 1401(19), even though it was not contained within the four
> corners of the IEP.

<u>Id.</u> at 1190. (emphasis supplied).

     The Sixth Circuit continued by recognizing the importance placed on procedural

safeguards of the IDEA by the Supreme Court in <u>Bd. of Educ. v. Rowley</u>, 458 U.S. 176 (1982).

"[T]he [Supreme] Court's continued emphasis on the *procedural* safeguards afforded to parents

convinces us that the Court was referring to the process by which the IEP is produced, rather than

the myriad of technical items that must be included in the written document. . . . Adequate

parental involvement and participation in formulating an IEP, not adherence to the laundry list of

items given in section [IDEA], appear to be the Court's primary concern in requiring that

procedures be strictly followed."  <u>Id.</u> at 1190-91.

     The record in this case bears out the fact that the parents participated in the development

of the IEP.  Plaintiffs attended the IEP meeting on January 23, 2004.  They provided, and the

District considered, their recommendations made by J.N.'s parents through the report of Ms.

Zdroik.  (ALJ Opinion, Ex. R-55 and P-55.)  The District provided a choice for the parents as to

whether J.N. should be placed in the Resource Center, or remain in mainstream classes with in-

class support.  Plaintiffs were given time to consider the draft IEP and then submit their

objections.  The District responded to these objections.

It is also clear that the lack of goals and objectives did not result in the loss of educational

opportunity.  Helen Fersko testified that the goals written into the IEPs of students in pull-out

classes were replaced by the goals of the regular curriculum.  (T1:124:11-18) ("[I]f they're in the

mainstream program, they're [sic] monitoring is the report cards and the current . . . status and

IEP meetings and team conferences, [and] progress reports from teachers that are sent home.")

Further, nearly all of Plaintiffs' recommendations appeared in the final IEP.

The parents were allowed to participate in the development of the IEP, and, therefore, the

lack of goals and objectives in the IEP is not a sufficient basis to demonstrate that Defendant

denied J.N. a FAPE.  Plaintiffs failed to demonstrate, by a preponderance of the evidence, that

the IEP was inappropriate due to the lack of stated goals and objectives.

### B.    Defendant Ignored Requests for Changes and Accommodations

Plaintiffs also contend that the District failed to consider several requested changes to the

IEP, which resulted in the IEP being insufficient to provide a FAPE.  Despite citing to it

incorrectly, Plaintiffs appear to base this argument on 20 U.S.C. § 1415(b)(3)(B), which states

that "[t]he procedures required by this section shall include . . . written prior notice to the parents

of the child whenever [the District] . . . refuses to initiate or change . . . the identification,

evaluation, or educational placement of the child."  Essentially, Plaintiffs argue that Defendant

failed to set forth why they did not make the changes requested.  This assertion is not borne out by the record.

The IEP itself provides notice that some of Plaintiffs' requests were not going to be included.  A cursory examination of the finalized IEP demonstrates that it includes all but four of the requests of J.N.'s parents: 1) goals and objectives; 2) supplemental instruction (organizational tutoring by a professional); 3) homework accommodations (no penalty for late homework); and 4) ESY services (the "Wilson Program").  (ALJ Opinion, Ex. R-57.)

There is no procedural violation of the IDEA because Defendant gave written notice of its decision not to implement some of the changes requested by Plaintiffs through the IEP.  Even if the law was such that the District should have sent a second written notice, Plaintiffs still fail to show how the error deprives J.N. of a FAPE.

As noted above, J.N.'s parents were involved in developing the IEP.  Thus, there is no serious infringement on the parents' opportunity to participate in the formulation of the IEP.  Also, the failure to deliver written notice, had the District made such a failure, would not have resulted in the loss of educational opportunity.  Plaintiffs were given ample opportunity to respond or challenge these rejections, both at the IEP meeting and in the days after, when J.N.'s parents were contemplating the IEP.

Here, too, Plaintiffs fail to demonstrate, by a preponderance of the evidence, that the IEP denied J.N. a FAPE.

### C.   Full Continuum of Special Education Programs and Services

Plaintiffs argue that Defendant failed to offer a full continuum of special education programs, pursuant to N.J. ADMIN. CODE § 6A:14-4.3(a).  Plaintiffs' argument seems to focus

upon the alleged failure of Defendant to offer small group or individual instruction in IRLA, paired with the mainstream class setting.  In essence, Plaintiffs persist that no middle ground exists, or was suggested, between the Resource Center initially offered, and mainstreaming with in-class support.  Defendants argue that ALJ Robinson's findings and conclusions are sound.

Here, the parents declined small group or individual instruction in one format, the Resource Center.  Instead, they demanded the format suggested by their independent expert. Helen Fersko testified that she continued to believe that J.N. could receive additional benefit from the Resource Center, but that she could not convince Plaintiffs to accept it.  (T1:159:25 to 160:5.)  Under IDEA, a school district need not maximize a student's potential or provide the best possible education.  A school district satisfies IDEA by "providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." Rowley, 458 U.S. at 203.  The District attempted to accomplish this through the Resource Center.

As in the seminal IDEA case, Rowley, Plaintiffs are requesting something more than is required by the IDEA.  In Rowley, the parents of a deaf student, who was receiving personalized instruction, requested a sign-language interpreter.  When the school district denied this request, the parents brought suit.  Rowley, 458 U.S. at 184-86.  Ultimately, the Supreme Court of the United States ruled that because Amy, the child in Rowley, was advancing from grade to grade and attaining above average test scores, the refusal to provide a sign-language interpreter did not deny the student a FAPE.  Rowley, 458 U.S. at 210.  Essentially, where a student is progressing educationally, as evidenced in Rowley by the student's advancement from grade to grade and test scores, a school district is not required to offer more in order to provide a better, or the best,

17

education.

J.N.'s parents' disagreement with the Resource Center does not force the school, under the IDEA, to come up with another method to reach the same goal. Indeed, Ms. Fersko testified that she believed that what the IEP offered, with the Resource Center, was the appropriate program for J.N., and that she would receive educational and other benefits from that program. (T1:159:25 to 160:5.) Thomas Sampano, a school psychologist and member of the CST, testified at the hearing that the finalized IEP was an appropriate program for J.N. for seventh grade, despite the fact that a better program was offered. (T3:78:8-13.) At the hearing, Plaintiffs' expert testified that she believed that the type of small group instruction offered by the District would not best suit J.N. (T5:83:1-23.) Further, the record reflects that J.N. made steady educational progress, progressing from grade to grade, on schedule, and attaining at least average test scores. (ALJ Opinion, Ex. R-57.) But, again, the test is not whether the District could provide a better, or the best, situation.

Plaintiffs fail to demonstrate, by a preponderance of the evidence, under this theory, that the IEP denied J.N. a FAPE.

### D.    Maintaining Status Quo

Plaintiffs argue that Defendant failed to provide services and accommodations by maintaining the status quo. At its core, this is a rewording of the argument set forth in Part C, supra.

Plaintiffs argue that a) Defendant offered the Resource Center, to address J.N.'s needs in IRLA, b) once the parents declined the Resource Center, Defendant simply reinstated the prior year's plan in the IEP. Plaintiffs urge that, Defendant, instead, should have offered a third

option.  As set forth above, ALJ Robinson heard testimony from Plaintiffs that the Resource

Center was the program from which Fersko and Sampano believed J.N. would benefit most.

However, the parents rejected this program, and the program eventually set forth in the finalized

IEP was also deemed appropriate.  (Fersko, T1:159:25 to 160:5; Sampano, T3:78:8-13.)

The standard is not whether the District offered the best education, or the education with

the items or programs that parents want most, but whether it offered a free appropriate public

education.  Plaintiffs have failed to demonstrate, by a preponderance of the evidence, that the IEP

did not offer a FAPE.

### E.    Access to the Draft IEP

Plaintiffs argue that Defendant denied them access to a draft IEP, which placed J.N. in the

Resource Center for IRLA.  Plaintiffs argue that in doing so, the District violated N.J. ADMIN.

CODE § 6A:14-2.9(b), which requires parents to have access to pupil records.  Here, as with the

failure to include goals and objectives, this Court finds that the District violated the IDEA.

The failure of the District to produce the second draft IEP, (that IEP was ultimately

discarded at the request of the parents) did not detract from the ability of the parents to

participate in the process of developing the IEP; in fact, the IEP, in essence, had already been

developed.  The finalized version sent to J.N.'s parents after the District received J.N.'s parents'

letter objecting to the draft IEP was, under the New Jersey Administrative Code, the only IEP

necessary.  N.J. ADMIN. CODE § 6A:14-3.7.

As a practical matter, the refusal to produce the second draft IEP was imprudent.  This

Court cannot fathom the harm that could have come from allowing the parents to examine the

alternative IEP considered, but not adopted, by the CST.  However, the procedural violation does

not result in the loss of educational opportunity, nor does it seriously infringe on the parents'

opportunity to participate in the process of formulating the IEP.  As set forth <u>supra</u>, in Section A,

J.N.'s parents were given the opportunity to participate in the creation of the IEP.  They provided

input via the report of Ms. Zdroik.  They attended the January 23, 2004 meeting.  They were even

given the opportunity to approve or deny assignment to the Resource Center for J.N.  Further,

Plaintiffs' evidence does not support a finding that the District's refusal to produce the second

draft IEP created a "loss of educational opportunity," – the offer of the educational opportunity at

issue had already been made and rejected.  <u>See</u> <u>Denton</u>, 895 F.2d at 982; <u>C.M. v. Union County</u>,

128 F. App'x at 881.

     As this Court found, <u>supra</u>, this procedural issue does not rise to the level of violation of

IDEA, such that J.N. was denied a FAPE.

## II.    <u>Educational Benefit</u>

     Having determined that the purported procedural violations Plaintiffs posit do not result

in a denial of a FAPE, this Court must determine, as succinctly set forth by Plaintiffs' counsel at

oral argument, whether the IEP offered provided a FAPE.  In other words, this Court must

answer the question "is the individualized education program developed . . . reasonably

calculated to enable the child to receive educational benefits?"  <u>Rowley</u>, 458 U.S. at 206-07.

     In determining whether the educational program set forth in an IEP is appropriate,

"[d]istricts need not provide the optimal level of services, or even a level that would confer

additional benefits, since the IEP required by IDEA represents only a 'basic floor of

opportunity.'"  <u>Carlisle Area Sch. v. Scott P.</u>, 62 F.3d 520, 533-34 (3d Cir. 1995) (quoting

<u>Rowley</u>, 458 U.S. at 201).  However, an IEP must be sufficient to confer more than a trivial or de

20

minimus educational benefit.  Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171,

181 (3d Cir. 1988); see also T.R. v. Kingwood Township Bd. of Educ., 205 F.3d 572, 577 (3d

Cir. 2000) ("'[T]he provision of merely more than a trivial educational benefit does not meet' the

meaningful benefit requirement of Polk.") (quoting Ridgewood Bd. of Educ. v. N.E. for M.E.,

172 F.3d 238, 247 (3d Cir. 1999)).

　　　Therefore, the appropriate inquiry is not whether the IEP imparts more than a trivial

benefit, nor whether the IEP imparts the maximum benefit.  The appropriate inquiry is whether

the IEP would confer a meaningful educational benefit.

　　　Aside from the findings discussed above, this Court, agrees with the remaining findings

of ALJ Robinson.  Because this Court received no new evidence, this Court cannot disturb the

findings of ALJ Robinson unless "it [can] find support for any factual conclusions contrary to the

[those of] the ALJ . . . in the record before it[, and] explain why it does not accept the ALJ's

findings of fact."  This Court did not locate any support for contrary conclusions on the

remaining findings.

　　　Specifically, this Court agrees with ALJ Robinson's finding that the IEP "was created to

provide for a nurturing situation in a structured system, which would encourage success, create

grade enhancement[,] and confer meaningful education[al] benefit to [J.N.]"  (ALJ Opinion 33.)

This Court recognizes that Plaintiffs offered alternative expert testimony to contradict the

appropriateness of the IEP.  However, this Court did not find anything in the record that would

indicate that ALJ Robinson erred in agreeing with Defendant's experts.  In fact, this Court finds

the testimony provided by Ms. Fersko, Mr. Sampano, and the other members of the CST team, to

be stronger than the opinion set forth by Plaintiffs' witness, Sandra Newman.[9]  (T4:19:21 to

20:11.)  Indeed, Ms. Newman was not admitted as an expert in reading, one of J.N.'s primary

areas of concern.

Further, the IEP was individualized to address J.N.'s specific needs.  The CST, at the

request of J.N.'s parents, kept J.N. in mainstream classes.  There is a strong preference under the

IDEA for mainstreaming.  20 U.S.C. § 1412(a)(5)(A).  Within the mainstream education, the IEP

provided in-class support and accommodations, which included, but were not limited to:     1)

alerting J.N. to important directions; 2) closely monitoring J.N. to make sure she understood each

task; 3) encouraging J.N. to request help when she does not understand; 4) not penalizing J.N. for

misspelling; 5) providing guidance for any structural writing; 6) providing outlines for any

writing assignments; 7) requiring J.N. to keep an assignment sheet; 8) providing written study

guides; 9) extending time for examination; 10) grading J.N. based on the content of her response,

and not on any errors in language or mechanics; 11) using a homework pad where teacher and

parent initial each task; 12) providing a copy of class notes to J.N.; 13) allowing J.N. to clarify or

elaborate orally on written responses to tests and quizzes; 14) reinforcing appropriate

participation; 15) teaching J.N. to circle or highlight key words on tests and quizzes; 16)

---

[9] Sandra Newman was qualifed by ALJ Robinson as an expert in teaching students with
disabilities.  (T2:20:10–11.)  She earned an undergraduate degree in special education and
learning disabilities from Ohio University, and her Master's Degree from Teachers College,
Columbia University.  (T2:4:20-25.)  She is licensed in the State of New Jersey as a learning
disabilities teacher consultant and as a teacher of the handicapped in elementary education.
(T2:5:5-9.)  She is also a member of the Orton Gillingham Society and several other private
associations, which offer courses in the teaching of disabled children.  (T2:5:10-25.)  She
reviewed documents provided by Plaintiffs' attorney in order to give her opinion at the
administrative hearing.  She also observed the educational programs offered by the District and at
the Winston School.  (ALJ Opinion 22.)

permitting J.N. to read aloud only when she volunteers; and 17) providing word banks on fill-in-the-blank tests.  (ALJ Opinion, Ex. R-55, Part B-4 and 5.)

This process provides a significant amount of in-class assistance.  Several of these accommodations were new to J.N.'s IEPs, as they were requested by J.N.'s parents specifically. This Court finds that the IEP provided "education 'in the least restrictive environment that [would have] provide[d] [J.N.] with a meaningful educational benefit.'"  S.H., 336 F.3d at 265 (quoting T.R. v. Kingwood Twp. Bd. of Educ., 205 F.3d 572, 578 (3d Cir. 2000)).

A review of the record indicates that J.N. has received a meaningful educational benefit from past IEPs, as well.  She has advanced from grade to grade, maintaining similarly sufficient grades while advancing.  (ALJ Opinion Exs. R-45 and R-78 (J.N.'s Report Cards for Sixth and Seventh Grades).)  J.N.'s progression is also evidenced by her standardized test scores, as summarized by Plaintiffs' expert, Dr. Jane Healey.  (ALJ Opinion, Ex. P-2 (Evaluation of Jane Healey, Ph. D., dated May 13, 2004).)

In the Woodcock-Johnson III Tests of Achievement administered on February 10, 2004, while J.N. was in 6th grade, J.N.'s performance in all areas were within the average range.  (ALJ Opinion, Ex. R-70 (Independent Educational Evaluation of Jean C. Wotowicz, M.A., LDT-C, dated February 10, 2004) at 12.)  J.N.'s performance was:  very superior in written expression (grade equivalent 18)[10]; high average in written language (grade equivalent 10.3); average in reading (grade equivalent 5.4), basic reading skills (grade equivalent 4.1), mathematics (grade

---

[10] The term "grade equivalent" refers to J.N.'s abilities, as measured by the commensurate school grade level, when compared to others at her age level.  (ALJ Opinion Ex. R-70, at 2.) Grade equivalents above 12 indicate levels above 12th grade comptency.  (See id. at 3.)  Grade Equivalent 18 is the highest "grade equivalent" measured in the Woodcock-Johnson III Tests. (See id. at 13.)

equivalent 5.4), math calculation skills (grade equivalent 5.3), and phoneme-grapheme

relationships (grade equivalent 4.3). The last category, J.N.'s knowledge of phoneme-grapheme

relationships placed her in the low end of the average score. (Id.) However, J.N.'s total

academic achievement placed her in the average range (Grade 6.4). (Id. at 3.)

J.N.'s progression and advancement in her grades and test scores is significant to this

Court's determination regarding the appropriateness of her seventh grade IEP, because the

seventh grade IEP included additional accommodations to assist J.N. Further, Defendant offered

additional changes intended to assist J.N., i.e., the Resource Center,[11] but J.N.'s parents declined

those changes.

It is correct that Plaintiffs disagreed with J.N.'s placement in the Resource Center and

requested an alternative to it in the final IEP. Plaintiffs also argued that J.N.'s needs in

organizational planning and homework assistance were not addressed. The appropriateness of an

IEP may be challenged "by identifying particular needs not addressed" in the IEP. Scott P., 62

F.3d at 534 ("[I]f a student had failed to make any progress under an IEP in one year, we would

be hard pressed to understand how the subsequent year's IEP, if simply a copy of that which

failed to produce any gains in a prior year, could be appropriate.").

These arguments, however, do not lead this Court to the conclusion that ALJ Robinson's

finding was flawed. More importantly, as this Court reviews this matter, using a modified de

novo standard, it is difficult to conclude that the IEP did not convey some meaningful

educational benefit. As set forth supra, the District attempted to address these issues with

---

[11] The IEP provided new in-class support and accommodations. See supra at 21 (numbers
4-9, 12, and 17 of this list were newly-offered accommodation).

assistance in the Resource Center.  When that offer was declined, the District continued the mainstream in-class support that J.N. received and included further accommodations to J.N.'s IEP.

The allegations by Plaintiffs that particular needs of J.N. were not addressed by the IEP are, in fact, disagreements in *how* those needs were addressed, and insufficient to demonstrate that the IEP did not convey any meaningful educational benefit.  It is also significant, although not dispositive in this Court's view, that ALJ Robinson made her finding that J.N.'s IEP provided a meaningful educational benefit, while the burden of proof rested with the District.  As acquiesced to by Plaintiffs at oral argument, that burden properly rests with Plaintiffs now.  The shift in the burden of proof makes more difficult Plaintiffs' quest in demonstrating to this Court that ALJ Robinson was wrong, and that the IEP was insufficient.

Based on a review of the record and ALJ Robinson's final determination, this Court finds that the IEP created for J.N. for the seventh grade school year conveyed a meaningful educational benefit, and, therefore, did not constitute a denial of a FAPE.

## CONCLUSION

This Court has reviewed the evidence in the record and ALJ Robinson's final determination.  Based on a preponderance of the evidence in the record, this Court finds that Plaintiffs have failed to meet the burden of proof necessary to establish that the IEP, created by Defendant, failed to offer J.N. a free appropriate public education.  Specifically, none of the alleged procedural flaws resulted in the loss of educational opportunity for J.N., nor did those alleged flaws seriously infringe upon the parents' opportunity to participate in the formulation of the IEP.  See C.M., 128 F. App'x at 881.  Further, the review of the entire record leads this Court to the conclusion that the IEP for J.N. conveyed a meaningful educational benefit.  See Rowley, 458 U.S. at 201.

Plaintiffs' motion is DENIED.


  S/Joseph A. Greenaway, Jr.
  JOSEPH A. GREENAWAY, JR., U.S.D.J.

Dated: August 6, 2007